Good morning, Your Honors. Eric Jenkins on behalf of Appellant David Long. Unlike the previous case, this was a case that was decided on summary judgment, where the inferences to be drawn were supposed to be drawn in favor of Mr. Long. And, in fact, because this was a discrimination case, the standard by which those inferences were to be made was to be at the lowest level so as to allow the trier of fact to be the decider, if possible, if there was any evidence that the court could consider. You don't have to lecture us. I realize you are doing it for the benefit of the students, but I think we all understand the standard. Okay. So, in this case, we were presented with a very unusual situation. Mr. Echevarria and I... They're all unusual. Mr. Echevarria and I were at the trial counsel in the lower court here, and at the conclusion of argument, of oral argument in the summary judgment hearing, the judge actually said to us that he had his own interpretation of what should be the standard by which this summary judgment motion should be decided, and that that standard was whether or not Playboy had knowledge of the differential pricing between men and women. And at that point, Your Honor, I gave the judge a request that I be allowed to brief the issue of that knowledge and whether that knowledge should be decided through the aid and abet standard that the court wanted to use. Why are you telling us this? You've got a chance to argue, to brief us here. It's a question of law whether knowledge is required. Correct. So, you got briefing, you didn't get briefing. You did brief us here. I did. So you can talk about it. Okay. Why complain to us about what happened or didn't happen below? Okay, so the evidence that was before the court included the testimony of Terry Thomerson. Well, do you want to talk about knowledge, whether knowledge is required? I mean, that's the key issue. That is the issue. Correct. Could I back up a bit? Because I was struggling with the legal issues. Sure. The district court, we're looking at Section 52, which is the basis for saying there's a violation of, I think it's 51.5 and 51.6. Now, we know from Harris that we interpret Section 52 to require intentional discrimination. For violations of the unwritten act. For violations of Section 51. And then we know from Munson that we don't apply that interpretation of 52 because we're still looking at the same words and the same statutes. So it's a little bit remarkable. But Munson says that doesn't apply to Section 51F, the ADA section that was added. Correct. But I didn't find any cases talking about how Section 52 applies to 51.5 and 51.6. I mean, there were some cases that came close to that, but I didn't see any that were specific. Now, normally we would just say the language in 52 means the same thing no matter what it's applied to. But we can't say that because of Munson. So my question to you is, do we have any guidance about how Section 52 applies to 51.5 and 51.6? Or is this the sort of question we would have to certify to the California Supreme Court to find out? We don't have guidance with respect to 51.5 and 51.6. But what we do have guidance to is in the Stamps case, which is cited in my brief, which talks about other similar cases which use Civil Code Section 52, which is the penalty statute for the UNRRA Act, the Gender Tax Repeal Act, 51.5, and some other related statutes that are addressed in the Stamp case. And in the Stamp case, the Court goes to great lengths to explain that the intentional conduct of the UNRRA Act is just the UNRRA Act, that the UNRRA Act has been treated through a series of, what the Stamps Court believed were poorly decided decisions as an omnibus bill that incorporated and kind of subsumed all of the surrounding but different statutes. And what the Stamps Court was trying to make very clear was you cannot treat all of these statutes the same. Each statute has its own purpose. For example, 51.6, the Gender Tax Repeal Act, was designed to put a highlight on the fact that it's not appropriate in this state to charge men and women different prices for dry cleaning or for haircuts. The Munson Court looked at the legislative history in saying that 51.F was just strict liability. But I didn't see any legislative history that would say that 51.5 or the Gender Tax Repeal Act, in fact the legislative history for the Gender Tax Repeal suggests that it's intentional, you know, like charging differently a dry cleaner or sort of actions that are intended by the individuals. So the legislative history doesn't seem to support your argument. Well, it doesn't. The conduct that you're describing would be conduct from the actual discriminator, not necessarily a third party that might be aiding the discriminator. Right. But didn't, I mean, Harris was looking at that very language and said that's what it means. It means intentional discrimination in 52. In the context of the Unruh Act, correct. But the language doesn't change when we apply Section 52 to these other statutes. That's what I find confusing. So I'm wondering if Munson, why we wouldn't just conclude that Munson was an exception, so that 51F, because it's ADA, because the ADA is strict liability, that's just an exception from our normal canon of statutory interpretation that language in a statute means the same thing, even if it's applied in different contexts. Well, again, the or, the disjunctive of the word or, I don't think was addressed in the Harris case. In fact, I know it wasn't addressed in the Harris case, and they just focused on whether there needed to be intent. And I don't think you have to have intent to aid someone other than to aid them. So then the focus of the word, what it means to intend to do something, shifts. It's not did you intend to, you didn't abet them or you didn't incite them, which is why I think that the prong of the aid or incite that Harris was focusing on. My question is similar to the concern that Judge Ikuta raised. You've got Harris on the one hand specifically looking at that language and saying that willful misconduct, essentially knowledge is required. And then you have Munson, which is specific to the ADA situation. So there's no guidance in between with regard to this particular fact, at least not from the California Supreme Court. So why can't we say, well, Harris is talking about situations like this case that involves general discrimination. Therefore, willful knowledge is required. Munson deals specifically with the ADA, and that has a unique history and legislative history reflects that. So that's treated differently. There's more of a strict liability notion with regard to ADA violations that's not imported into situations of general discrimination. For example, discrimination based on gender. Why can't we do that in looking at this case? Well, again, the problem here is that the cases haven't been articulate in breaking down the distinction on these third-party tort feasors here where they're either aiding or they're inciting. Just blend those two concepts together, and it would be nice to have some guidance either way. But I'm looking at this language in Harris. I just pulled out this quote. Looking at Section 52, the references to aiding and inciting, denial of access to public accommodations, to making discriminations and restrictions, and to the commission of an offense, imply willful affirmative misconduct on the part of those who violate the act. So the California Supreme Court specifically refers to aiding and inciting as being part of its interpretation to require willful affirmative misconduct. But there again, you used the word and as opposed to the word or. But they were looking at 52, so I don't see how that makes a difference. I mean, they were saying Section 52, the way we interpret it, requires affirmative misconduct, intentional misconduct. The way that my understanding is of the statute's purpose is to help to eradicate discrimination, whether it's through the entity that's engaging directly as a discriminator or with anybody that is assisting in that discrimination either through a direct encouragement, abetting it, or inciting it, or aiding it. The thing that he shows, Playboy was just providing a venue. No, they weren't just providing a venue, Your Honor. I disagree. They were actually, this isn't like renting out a hotel room in the Hollywood Hilton. This is Playboy. This is the appeal of Playboy. This is the mistake. Well, let's assume that you're right for a moment and that no specific willful knowledge is required. Where's the evidence that Playboy was in any way involved in the discriminatory pricing versus just catering and providing the location for the party? They just would have had to have been aware of it, according to the trial court judge. And the evidence there was Terry Tomerson's testimony, where she said that she reviewed all of the promotional materials for the event and that it was her custom and practice to save all of the promotional materials that she reviewed. And then when we asked in discovery for those promotional materials, oh, my goodness, how convenient. We've lost it. Do you agree with the district court? I mean, if you're arguing that it's like 51F, that it's strict liability, why does Playboy even have to be aware of their pricing? Is your argument that it's strict liability, that if something happens on the premises which is discriminatory, then Playboy is responsible? I think that the case law that we've cited in our brief says that that liability can be imputed to them. And in my brief, although it's been argued here that we didn't raise it in the trial court level, the imputed liability, the imputed knowledge that we're talking about here, the opening brief was replete with discussions of new or should have known about the discriminatory pricing. So that is a request to impute liability to them because they can't bury their head in the sand to say, oh, I didn't know it. Especially when one of their persons most knowledgeable, essentially the person that acted as the groundskeeper at Playboy, that's Mr. Fawcett, testified in his deposition that they put in their contracts when people leased the Playboy Mansion that they couldn't engage in online gambling. And the reason for that was because Playboy knew that it could be held liable if that unlawful activity was engaged in on their premises, whether they had direct knowledge of it or not. And so if they had knowledge that in some circumstances they could be imputed with liability for those who rented their grounds, then here we argue, especially in light of California's strong public policy against allowing discrimination to occur, that that type of unlawful conduct should be at a minimum imputed to Playboy. And even if this court were to decide that that issue was not addressed in the court below, the underlying facts in this case are essentially undisputed. And it's my understanding that if an issue is a purely legal issue, this court can decide it, and we've briefed that fully in our papers, the imputed liability standard. I'd like to reserve the rest of my time for comment here. Thank you. Good morning. Camillo Echavarria on behalf of Playboy. I want to just jump into the discussion that you were having regarding Harris and Munson. And I think what Munson, what they were, what that court, it was faced with a dilemma because in Harris they previewed Section 51 and 52 and interpreted aid or incite language to show intentional discrimination. But with Munson, it is that one particular section of the Unruh Act which says any violation of the ADA is a violation of the Unruh Act. And the plain reading of that statute kind of threw out the intentional discrimination aspect of what they were looking at. But aren't we left with the California Supreme Court tells us that you don't have to read Section 52 consistently. It can mean intentional discrimination in one context and strict liability in another context. So what's our guide for applying it to 51.5 and 51.6? I think the guide is looking at the plain language of the statute of 51.5, 51.6, and 51, which is 51 is what Harris did, and then look at 52 with it. And if you look at 51.5, the standard is that Playboy discriminated against plaintiff on account of his gender. Substantial motivating reason is gender. That's what's required under that statute. And under 51.6, Playboy charged plaintiff more because of his gender. Playboy's conduct was a substantial factor. So you look at that plain statute and that statute is showing intentional discrimination. That's what they're intended to do. And then you can look at Apply Harris on their interpretation of 52. What happened with Munson is the plain language of the statute of 51.5 is there's no intent to require any violation whatsoever. So I think that that would be appropriate to show that. And actually one point in the Cone versus Corinthian College's case, they did address the Gender Tax Repeal Act at page 530. And there what they said is intent for the Gender Tax Repeal Act is a crucial differentiating factor. So they said and they found that the intent there for distributing the tote bags was to give a gift as opposed to differentiate between the genders and avoid the requirements of the statute. Chris, they also said motherhood wasn't gender related. It's true. It's true. That was an interesting point they made. So I do think that knowledge is these statutes. What are the statutes? You know, we take one step back. Carving out sub F, which was included later into the statute and said NEADA. If you take a step back, these statutes are meant to prevent intentional discrimination based on gender, race, all of these things. And so to discriminate, the case law is clear. You need to have first knowledge. You have to have knowledge. And then you also have to do something. So where are we with knowledge? There is no knowledge. And the evidence was multiple. There is Ms. Thomerson's testimony where they asked her. All we need is an inference of knowledge, right? No, it's a must have known. It's an intention. No, no, but there has to be an inference if there was knowledge. Right. And there's nothing. We don't have to have conclusive proof. You don't have to have six bishops come in here. Correct. Inference. Why isn't there plenty of evidence here from which Tyler Fack can draw an inference? Sure, sure. There's actually zero evidence to show that Playboy knew about the pricing. The evidence that Playboy didn't know, first is Thomerson. What about the evidence opposing counsel cited? Sure. The evidence opposing counsel cited was simply this. Ms. Thomerson was asked, do you usually keep these records, the records related to each event held at the Playboy Mansion? And she testified, they are usually in my computer. And then she later testified, but with respect to this party, I don't have them. I couldn't find them. There is no evidence that she destroyed them improperly, that they somehow existed. The litigation was filed and then it was destroyed. Did she testify that she reviewed them? Yes, she testified she reviewed all advertisements and that she did not recall seeing any pricing. And so you have her testimony that says, I don't recall ever seeing pricing. So she says, I usually keep these things and I review them. Now, why couldn't a tile fact from those two statements that come from your client's agent draw the inference, she did in fact look at this advertising and seeing that it was naughty, destroyed it? Well, first thing is... You don't think the opposing counsel would stand up and make that to the jury? They look interesting to me. Well, two points to make for that. Just one point, if you can have one point that knocks it out, you don't need two. You got it. When I say two points, I know that neither of them is quite making. If they don't believe what she's testifying on the stand, they don't believe her, it cannot be used for the opposite proposition. They believe her, but I think we all know, you've been in trials before. Of course. Existing judges instruct that you can believe a witness partially, not completely. And they could say, look, we believe the part where she says, I always review these documents. We don't believe the part where she says, I don't remember reviewing these documents. And we certainly don't believe the part where she says, I never put it in my computer and I don't know what happened to them. We think she actually deleted them. So we believe the first part. And on the second and third part, we actually not only don't believe her, but the gap, the absence of belief, creates a negative influence that she had an animus. What do you do with that? But I think what you're saying is, if you core it down, you're saying, she's saying, I didn't see any advertisement with pricing. And you're saying they don't believe her, so that she must have seen advertising with pricing. You left out the first part. She says, I review everything. I review everything, right? Yes. They believe that. They think it's gospel truth. And when they say she says everything, they mean everything, including this one. So they must have reviewed this one because we believe statement one. Now we are faced with the fact that she now claims not to remember. We don't believe that, so we still think she reviewed it. And then she says it's not in the computer, even though I always say them. This time I don't find it. You usually say them. Usually say them. And we think maybe she deleted them. Okay. Okay. You've seen jurors do strange things. I have. And I also know that you cannot, this belief of a witness, you cannot be used for the opposite proposition. It's a longstanding rule. It was first announced by Judge Learned Hand, actually, in the Dwyer v. McDougall case, 201 F. 2nd, 265. That's a second sentence. Oh, I understand. And there's Binder v. Sweet, 117 Calab 4th, 218. So what's the opposite? You said you can't use. So you can't. If I go out and I'm testifying and I say it was raining that day and they don't believe, the jury says, I don't believe that guy. He's a liar. And therefore, we're going to say it wasn't raining. You can't do that. There still has to be evidence that it was sunny. So you're saying it doesn't raise an inference that it was sunny on that day. Is that what you're saying? If that's all you have. But in this case, he says, I walked out with an umbrella. You know, so believe that part. That this is all they have. No, they have her statement. And that she believes that she reviews every one of these. Correct. Do we know what the documents are? I'm sorry? I mean, the plaintiff here was not able to identify the party producer. And so he did not have evidence about what the party producer gave to Ms. Thomerson. Is that correct? Well, they knew who the party producer was but weren't able to look. Okay, so was there evidence as to what documents were given to Ms. Thomerson? Ms. Thomerson testified of the type of documents she typically receives. She was shown documents where she said, that looks like something I reviewed. And the ones that she said, those look like something I reviewed did not have any pricing information. She was shown documents with pricing information. She said, I don't remember ever seeing those. And so, to answer your question. So her testimony was that she didn't review documents that had pricing information? That she did not recall reviewing those, correct. And was there any evidence that she would have been given them or she had been given documents with pricing information in them? No evidence whatsoever. The evidence showed the contracts required, Playboy received gender, a set price regardless of gender. The testimony is Playboy has no involvement with the pricing. Playboy does not dictate pricing. Playboy does not get money from anybody who attends the event. They don't choose who attends the event. I thought she reviewed the advertising. Correct, but the discriminatory act here is the despair of pricing. So they're trying to say, if she had seen the advertising. I guess I don't know about the advertising. Does the advertising not list the pricing? Correct. The advertisement that she testified she saw did not list pricing. Did she testify she doesn't remember the list of prices? Or do we know what the advertising was? Do we have advertising for the event in the record? Her file on this party doesn't exist. She testified she was shown some advertisements and said, I think I remember seeing that advertisement. And then with respect to the pricing, I don't remember seeing that. And I don't remember seeing anything with pricing on it. And is that advertising she was shown in the record? Yeah. Yes, Your Honor. Does that show pricing? The one that she said she saw? No. It does not. And I want to kind of take one step further. We've been focusing on knowledge. But I think in addition to knowledge, there has to be affirmative, willful misconduct here related to the despair of pricing. Counsel talks about aiding or inciting. And then the district court looked at the aiding and abetting standard. But you can infer all of that. I mean, let's say it said no Irish allowed, you know. Well, they would these days. But let's just say, you know, this was an old-time thing. Sure. Or, you know, whites only. You wouldn't have to infer a lot of... But Playboy would have to be... How much do you need after that? Playboy would have to be involved in that aspect of the situation. So they show the advertising and say we're going to run this ball. And it's a white ball in more ways than one. Right. It's really white. Right. Exactly. And they say, okay, go for it. And you think they get off? I think knowledge alone is not enough. You have to show affirmative, willful misconduct on the part of Playboy to have that. How much misconduct do you have in having this discriminatory party in your premises? Well, let's say, okay, let's say we have an event at the Ritz-Carlton. I'm part of the Hispanic National Bar Association. Every year we have a big conference. This year the Hispanic National Bar Association... Hispanic is disbanded. So this year they go, you know what, we want to have the event for only Hispanic lawyers. That's it. We're not going to allow anyone else. And it's at the Ritz. Under this theory, if the Ritz learns about that, they're now liable for an Unruh Act violation? They might be. I think it's aiding or... I think that's why they always invite me to Malala. Well, this is why there's intentional. It needs intentional discrimination. And you have to participate. Or substantially, it's... Excuse me. You have to be a substantial participant. Yeah, I don't know. Let's follow that. Let's say the Hispanic Bar Association, you pick the group. It says Hispanics only. And you know, the big sign, Hispanics only. And they have people at the door checking if you're not Hispanic, you get turned away. You think it's not possible that the hotel would be liable for that? I think that's right. If the hotel is therefore checking people at the door and saying, you're Hispanic, you're not, you're out, I think you're right because they are providing substantial assistance or encouragement to that discriminatory act. But let's say it all happens... How about when that Anglo guy sits down and says, oh, no, no meal for you? Right. Well, is the server then liable? But the point, right, if all your examples are showing, they have to do, they are participating in the discriminatory act. If everybody buys tickets, right, so it's the HNBA, the Hispanic National Bar Association, who sells the tickets, gets the tickets, decides who can attend, and then people show up to attend the event and they say, here's the ticket, and the hotel lets them in. Yeah, I don't think they can be liable for intentional discrimination under these statutes. Even if they know. Even if they know. A willful affirmative misconduct, that's under Harris. Aiding and abetting. Aren't you reaching farther than you need to in this case? Well, I think, I agree with you. So it's a good way to stumble. I agree with you. We definitely have knowledge as the first key point and that there's no evidence because we don't have any even contact with the people before they even arrive. So you're right on that. We don't need to get there. But, you know, I just wanted to make a point that it's a two-part test and this report only got to the first part. We were entitled to summary judgment under both. Thank you. Thank you. I think you have three minutes left. We'll make it even three minutes. Thank you, Your Honor. With respect to Ms. Thomerson's testimony, because I think there's some confusion here, she was shown a number of promotional materials for this event. Some of them had the pricing for the event on it. Some of them did not. And what she testified to was that she remembers reviewing promotional materials that had the Playboy logo on them, but she could not recall whether she reviewed the materials that had the pricing on them. Of course, we weren't there when she reviewed the materials. It wouldn't have been possible for us to say. So we showed her everything that we had that my client had viewed for the parties. When you say promotional materials, is that different from advertising? No, advertisement. It's a little online. Like ads, right? Yes, ads that say men $650, women $300. And what Ms. Thomerson testified to was even if she had reviewed promotional materials that had the pricing on them, that wouldn't have been her focus. Her focus was to look for things like trademark violations, where the promoters were using the Playboy logo or the Playboy bunny in violation of the terms of the contract. So she wasn't even looking for the pricing. So she just couldn't remember. But what was interesting, Your Honors, is that as to the things that she reviewed. But that sounds right. She was probably looking there for stuff that impacts the employer. Correct, Your Honors. But she testified that as to those things that were specific to this party's pricing, oh, I don't remember seeing that. But as to things that were the Playboy logo, yeah, I probably reviewed that. That looks consistent with what I reviewed. And what the Lamb case and some of the other cases that talk about why you don't have the trial judge on summary judgment decide these credibility issues and why you allow the trier of fact to do so, it's because the jury should be the one that's deciding whether she's being truthful on the first part of your example about whether it's raining outside or not. And the pricing differential has the Playboy logo on it? Many of them did, yes. I'm sorry? Yes. Many of them did. And those facts are undisputed. So the chain of inference is she admits to reviewing some stuff. Yes. She doesn't remember reviewing those things and the jury can infer that she did review them. Correct. And in your view that would be enough to support a finding of knowledge? Absolutely. Because it has a differential pricing for men and women. What about this other point that the closing counsel raised in that you need more than knowledge, you need some sort of guilt participation? Substantial assistance is the words that the statutes use. The wording from Harris only applies to the un-react and we're dealing with more than the un-react here. So it's substantial assistance, and that goes to the aiding element of aid or insight. I'm out of time here, but I'm happy to elaborate. Okay, thank you. In case you are, you will stand submitted. We are adjourned. All rise.
judges: Kozinski, Ikuta, Nguyen